IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA,<br><br>    Plaintiff,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>    Defendant. | CIVIL ACTION<br><br>FILE NO.  1:15-CV-2594-MHC |

**DEFENDANT PUBLIC.RESOURCE.ORG, INC.'S
LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

    **A.**    **Public Resource and Its Mission**

    1.    Carl Malamud is the founder of the nonprofit Public.Resource.org ("Public Resource"). Declaration of Carl Malamud ("Malamud Decl."), Ex. A at ¶¶ 1, 14; Ex. B.

    2.    Mr. Malamud founded Public Resource in 2007 to address an absence of primary legal materials on the Internet, including judicial opinions (and the underlying dockets leading to those opinions), statutes and the codifications of

those statutes (including the legislative hearings that led to those statutes), and federal regulations (including the underlying notices and comments leading to those regulations).  Malamud Decl., Ex. A at ¶¶ 15, 19.

3. Mr. Malamud found that most states' statutes, regulations, and the codification of those statutes and regulations were publicly available in some form on the Internet. *Id.* at ¶ 33.

4. The technology employed to make those materials available to the public, however, did not provide the information in a user-friendly fashion or take advantage of the features of the Internet and its potential.  *Id.*; *see also* Declaration of Beth Noveck ("Noveck Decl."), Ex. C at ¶ 14.

5. In an effort to remedy this shortcoming, Public Resource has made publicly available on the Internet, for example, copies of the Oregon Revised Statutes, California Code of Regulations, District of Columbia Code, and the Chicago Building, Municipal and Zoning Codes.  Malamud Decl., Ex. A at ¶¶ 31, 34, 37, 39.

6. In each of the above instances, Public Resource's posting of these edicts of government resulted in an improved web presence coded by individuals and volunteers and increased public access for the materials.  In the cases of

Washington, D.C. and Chicago, city officials also were involved in the process. *Id.* at ¶¶ 31-41, 44.

7. Indeed, making edicts of government, such as legal codes, available in bulk leads to more innovation, a better-informed citizenry, and a better democracy. Noveck Decl., Ex. C at ¶ 14.

### B. History of the Code Revision Commission & the Official Code of Georgia Annotated

8. The State of Georgia enacts and promulgates its laws through its legislature. Stipulation of Facts ("Stip."), Dkt. 17 at ¶ 44.

9. Georgia's Constitution provides that "[t]he General Assembly shall provide for the publication of the laws passed at each session." Ga. Const., Art. 3, Section 5, ¶ 1.

10. It is typical for bills introduced in the General Assembly to begin, "an Act to amend Article…Chapter…Title of the Official Code of Georgia, Annotated," Stip., Dkt. 17 at ¶ 81, as required by Georgia's Constitution, Ga. Const., Art. 3, Section 5, ¶ 4.

11. Each year the General Assembly passes a bill to reenact the statutory portions of the O.C.G.A. Senate Bill 340 (2014), Ex. M.

12. The Code Revision Commission assists the legislature in publishing the laws it enacts in the Official Code of Georgia ("O.C.G.A."). Stip., Dkt. 17 at ¶ 82.

13. The Commission was created by the General Assembly in 1977 and tasked with selecting a publishing firm "possessing the necessary expertise and manpower to accomplish a complete recodification [of the state's laws] as quickly as possible." Ga. Code Ann., Foreword, Ex. D at ix-x.

14. The Code Revision Study Committee, also created by the General Assembly, concluded that a complete revision and recodification of the state's laws was "long overdue" and that "the most economical and satisfactory method to accomplish code revision within the State of Georgia is through a negotiated contract with a publishing firm possessing the necessary expertise and manpower to accomplish a complete recodification as quickly as possible." *Id.* at ix.

15. Upon the Study Committee's recommendation, the General Assembly created the Commission to select a publishing firm and "resolve the myriad of details connected with the code revision project." *Id.* at ix-x.

16. The Commission is composed of the Lieutenant Governor, four members of the Senate, the Speaker of the House of Representatives and four additional members of the House of Representatives, and four members appointed

by the State Bar of Georgia, one of whom is a judge or senior judge of the State Superior Courts and one of whom is a State district attorney.  *Id.* at x.

17.  From five law publishers, the Commission selected The Michie Company to prepare and publish what would become the O.C.G.A., and entered into a contract.  *Id.*

### C. The Publication Agreement between Lexis/Nexis & the Commission Regarding the O.C.G.A.

18.  Despite contracting with Michie, the Commission itself developed the uniform numbering system and rules of style used in the new (1981) Code and adopted an arrangement into 53 Code titles.  *Id.* at xi.

19.  Upon completion of the editorial process, a manuscript entitled the *Code of Georgia 1981 Legislative Edition*, was prepared, presented to the General Assembly, and enacted at the 1981 extraordinary session of the General Assembly.  Annotations, indexes, editorial notes and other materials have been added to that manuscript to produce the Official Code of Georgia Annotated, the first official Code to be published under authority of the State of Georgia since the Code of 1933.  *Id.*; Terry A. McKenzie, *The Making of A New Code*, 18 Ga. St. B.J. 3 (1982), Ex. E at 2.

20.  On October 3, 2006, the Commission issued a Request for Proposals, and on December 27, 2006, entered into a new Agreement for Publication

("Agreement") with Matthew Bender & Co. Inc. ("Lexis/Nexis").  Publication Agreement, Ex. F at 1.

21.     The Agreement requires the official Code to include not only the statutory provisions, but also "annotations, captions, catchlines, headings, history lines, editorial notes, cross-references, indices, title and chapter analyses, research references, amendment notes, Code Commission notes, and other material related to or included in such Code at the direction of the Commission."  *Id.* at 2.

22.     Each O.C.G.A. volume and supplement therefore contains statutory text and non-statutory annotation text, including judicial decision summaries, editor's notes, research references, notes on law review articles, summaries of the opinions of the Attorney General of Georgia, indexes, and title, chapter, article, part and subpart captions, and others (collectively, "annotations") that are prepared by Lexis/Nexis under the requirements of the agreement.  Stip., Dkt. 17 at ¶ 1-3, 9, 18, 26.

23.     The Commission has regularly asserted copyright in the "catchlines of Code sections; names of Titles, Chapters, Articles, Parts, and Subparts; history lines; editor's notes; Code Commission notes; annotations; research references; cross-references; indexes; and other such materials."  Dkt. 17-8 at 1.

24.     The Agreement requires Lexis/Nexis to adhere to the organization and numbering used by the previous publisher.  Publication Agreement, Ex. F at 3.

25.     The Agreement also provides that the Commission, not its hired publisher, has "the ultimate right of editorial control" both over all material contained in the O.C.G.A. and over what material is selected to become part of the O.C.G.A.  *Id.* at 2.

26.     The Agreement requires Lexis/Nexis to follow the Commission's detailed publication manual, which "reflect[s] those specific content, style and publishing standards of the Code as adopted, approved or amended from time to time by the Commission or its staff pursuant to Code Section 28-9-3 of the Official Code of Georgia Annotated." *Id.*.

27.     Lexis/Nexis does not choose which cases to summarize in the Code's annotations, as the Agreement requires Lexis/Nexis to summarize "all published opinions of the Georgia Supreme Court and the Court of Appeals of Georgia, and all published opinions of the United States Supreme Court and other federal courts that arose in Georgia and construed Georgia general statues, whether such decisions favor plaintiffs, defendants, or the prosecution." *Id.* at 3.

28.     The Agreement similarly requires that the Annotations include research references and legislative history.  *Id.* at 4-5.

29. The Commission's Publication Manual is even more detailed in its directions to Lexis/Nexis, for example providing nine pages of instruction in the proper formulation of amendment notes and ten pages to that of Editor's Notes. Publication Manual, Ex. G at 78-87, 99-109.

30. The Agreement requires that Lexis/Nexis provide Georgia's statutes unannotated ("Unannotated Code") on a website that the public can access for free using the Internet. *Id.* at 11-12; Stip., Dkt. 17 at ¶ 73-75.

31. The free public website contains only the statutory text and numbering of the O.C.G.A., stripped of its Annotations. Stip., Dkt. 17 at ¶¶ 73, 75.

32. The Agreement requires Lexis/Nexis to track usage of the Unannotated Code on the public website and to report annually to the Commission the amount of usage and whether its sales of, or subscriptions to, the printed O.C.G.A, the C.D. ROM version and similar commercial versions have decreased. Publication Agreement, Ex. F at 12; 2015 Usage Report, Ex. H..

33. The Agreement requires Lexis/Nexis to provide appropriate copyright notices on both the free public website for the unannotated Code and the online O.C.G.A. available as part of Lexis/Nexis for-profit online services and to notify visitors that any reproduction of the O.C.G.A. other than the statutory text and numbering is prohibited. *Id.* at 12.

36397002_1.docx

34. According to Lexis/Nexis's representative, Anders Ganten, the Agreement between Georgia, through the Commission, and the O.G.C.A.'s publisher is unique. Commission Minutes, Ex. I at 2.

35. "In other states, the work on annotations is done in house or contracted as a fee for service arrangement." *Id.*

36. In Georgia, Lexis/Nexis has the exclusive right to publish and sell the O.C.G.A. as a printed publication, on CD-ROM, and in an online version and receives income from its sales of the O.C.G.A. Stip., Dkt. 17 at ¶¶ 84-85.

37. The Commission, however, only receives royalties from the licensing fees for the CD-ROM and online versions of the O.C.G.A. Pl.'s Resp. to D.'s Interrogatories, Ex. O at 14.

38. In fiscal year 2014, the Commission received $85,747.91 in licensing fee royalties. Mar. 29, 2016 Letter from L. Pavento, Ex. J at 1.

39. For Lexis/Nexis, "the cost of publishing the Code rises each year" and "the print publication is a struggle each year." Commission Minutes, Ex. I at 2.

40. The Legislative Counsel publishes the *User's Guide to the Official Code of Georgia, Annotated*. User's Guide, Ex. N.

41. The User's Guide instructs those citing to the Code of Georgia to cite to the O.C.G.A. *Id.* at xvii

36397002_1.docx

42.     The User's Guide explains that some annotations are indexes, tables and research references that advise the reader of other materials relevant to understanding the nuances and interpretations of the statutory text itself.  *Id.* at xxi-xxii.

**D.     The O.C.G.A. as the only Official Code**

43.     The Annotations to the O.C.G.A. include a summary of a vacated Northern District of Georgia case that quotes "[a]ttorneys who cite unofficial publications of 1981 code do so at their peril."  The heading of that summary reads:  "Official Code publication controls over unofficial compilation."  Ga Code Ann. § 1-1-1, note (Judicial Decisions); Stip., Dkt. 17 at ¶ 94.

44.     Lexis/Nexis markets its printed O.C.G.A. stating "the Official Code of Georgia Annotated (O.C.G.A) provides users with the *official* Georgia statutes, fully annotated."  Stip., Dkt. 17 at ¶ 95; Ex. M to Stip., Dkt. 17-13.

45.     The Honorable Johnnie Caldwell, Representative, Chairman of the Commission and a lawyer in Georgia for at least 43 years, told the Commission that he buys the O.C.G.A. for the annotations.  Commission Minutes, Ex. I at 2.

46.     The judicial summary annotation for Ga. Code Ann. § 50-2-1 for the case *Dep't of Natural Resources v. Joyner*, 241 Ga. 390 (1978) reads:

> Salt waters of this state extend from the mean low watermark of the
> foreshore three geographical miles offshore; except where a low tide

- 10 -

36397002_1.docx

elevation is situated within three nautical miles seaward of the low water line along the coast, the state's three mile boundary is measured from such low tide elevation.

Ga. Code Ann. § 50-2-1 ann.

47. The judicial summary annotation for West's Code of Georgia Annotated for the same case reads: "Salt waters of Georgia extend from mean low water mark of foreshore three geographical miles offshore, except where a low tide elevation is situated within three nautical miles seaward of low waterline along coast, in which case state's three-mile boundary is measured from such low tide elevation." Ga. Code Ann. § 50-2-1 ann. (West 2016).

48. The judicial summary annotation for Ga. Code. Ann. § 50-2-1 for the case *State v. Bruce*, 231 Ga. 783 (1974) reads:

> Whichever line is correct, low tide or high tide, as the dividing line between private property sought to be registered and the state's property, the state is still an adjoining landowner and should have been so named in the petition and served other than by the advertisement "to whom it may concern," and a land registration judgment, if granted, would not be binding upon an adjoining landowner who was not named and served.

Ga. Code Ann. § 50-2-1.

49. The judicial summary annotation for West's Code of Georgia Annotated for the same case reads:

> Regardless of whether the low-tide line or the high-tide line was the dividing line between property sought to be registered and the

- 11 -

> State's property as the owner of the ocean within three geographical miles of ordinary low-water mark, State was an "adjoining landowner" and should have been so named in the petition and served other than by advertisement, despite contention that by reason of statute and revision of the Constitution petitioners were already owners of land between the high and low-tide marks and that the land which they were seeking to register, which had been built up by accretion, was only land above the high-tide line.

Ga. Code Ann. § 50-2-1 ann. (West 2016).

50. The judicial summary annotation for O.C.G.A. § 50-2-1 for the case

*Ga. Ry. & Power Co. v. Wright*, 146 Ga. 29 (1916) reads:

> That part of the Savannah River which is broken by islands, located between an island and the Georgia mainland, is within the jurisdiction and sovereignty of this state by virtue of this section, and a dam constructed across the river from an island to the Georgia shore is subject to taxation in this state.

Ga. Code. Ann. § 50-2-1.

51. The judicial summary annotation for West's Code of Georgia

Annotated for the same case reads:

> Under Beaufort Convention 1787 and Civ. Code 1910, § 16, that part of the Savannah river which is broken by islands, located between an island and the Georgia mainland, is in Georgia, and a dam from an island to the Georgia shore is subject to taxation in Georgia.

Ga. Code Ann. § 50-2-1 (West 2016).

**E.     Limitations on Public Access to the Unannotated Code**

52. To access the unannotated code via the website link found on the Georgia website, www.legis.ga.gov, one must accept the terms and conditions of use generally applicable to the Lexis/Nexis websites. Stip., Dkt. 17 at ¶ 86; Ex. I to Stip., Dkt. 17-9.

53. The access page that allows users to access the online publication, however, states that the Lexis/Nexis website use terms and conditions do not apply to the O.C.G.A. statutory text and numbering. Stip., Dkt. 17 at ¶ 86; Ex. J to Stip., Dkt. 17-10.

54. The Lexis/Nexis website use terms and conditions are governed by New York state law and require the user to submit to the personal jurisdiction of New York state courts for the purpose of litigating any action arising out of or relating to the Lexis Nexis website use terms and conditions. Stip., Dkt. 17 at ¶ 87.

55. Until at least May 28, 2014, the notice displayed before users could access the unannotated code on the public access Lexis/Nexis site included a banner page that the user had to acknowledge to gain access to the Lexis/Nexis site. *Id.* at ¶ 92; Ex. L to Stip., Dkt. 17-12. This banner page stated "the latest print version of the O.C.G.A. is the authoritative version." Stip., Dkt. 17 at ¶ 92.

56. This 2014 banner page also did not explicitly state that the Lexis/Nexis terms and conditions of use do not apply to the Georgia Code statutory text and numbering *Id.* at ¶ 93; Ex. L to Stip., Dkt. 17-12.

57. Once within the Lexis/Nexis public access site, one notice on the website is a hyperlink to the terms and conditions specific to the Georgia Code materials.  Stip., Dkt. 17 at ¶ 88; Ex. K to Stip., Dkt. 17-11.  These terms and conditions explain that a user may copy Georgia Code sections' text and numbering.  Stip., Dkt. 17 at ¶ 90.

58. At least one citizen of Georgia found the requirement to accept the Lexis/Nexis terms of use before being able to access the Georgia statutory materials "distasteful," particularly the provision agreeing to jurisdiction in a New York court and the provisions prohibiting use of the data even by "public and non-profit users." Declaration of Clay Johnson ("Johnson Decl."), Ex. K at ¶ 10.  The Lexis/Nexis free online site also suffers from technical challenges, including generating unwarranted security errors, displaying a blank screen in certain web browsers, lack of bookmarking function, lack of permanent links, HTML and CSS errors, and limited accessibility for the visually impaired.  *Id.* at ¶¶ 11-18.  Finally, it is unclear to users what Lexis/Nexis is doing with their search terms and navigation history.  *Id.* at ¶ 18.

- 14 -

### F. Alternatives for Access to the O.C.G.A.

59. Fastcase, Inc. ("Fastcase") provides subscribers a comprehensive legal research service, including cases, statutes, regulations, court rules and constitutions for all 50 states. Declaration of Edward Walters ("Walters Decl."), Ex. L at ¶ 8.

60. The Fastcase service is often offered to end users as part of an arrangement with state and local bar association, which contract with Fastcase so they may offer the service as a free benefit to their members. *Id.* at ¶ 9.

61. In January 2011, Fastcase and the State Bar of Georgia announced a partnership that made the Fastcase service available to the 42,000 members of the State Bar of Georgia. *Id.* at ¶ 10.

62. Fastcase has attempted on numerous occasions to license the O.C.G.A. from the State of Georgia and Lexis/Nexis, but has been informed that no license would be granted, at any price. *Id.* at ¶ 11.

63. Instead, Fastcase offers its subscribers a version of the Code of Georgia, but it is what O.C.G.A. § 1-1-1 terms an "unofficial compilation." *Id.* at ¶ 12.

64. Fastcase would prefer to offer the O.C.G.A. to its subscribers because it is the version of these edicts of government promulgated by the State of Georgia. *Id.* at ¶ 13.

### G. Public Resource's Posting of the Code

65. To make the O.C.G.A., including the annotations, available on the Internet, Public Resource purchased the entirety of 186 printed volumes and supplements of the O.C.G.A. and copied them all, including their front and back covers, and then posted those copies on its website: https//law.resource.org. Stip., Dkt. 17 at ¶¶ 34-36.

66. At least one copy of each O.C.G.A. volume and supplement that Public Resource posted on its https://law.resource.org website is in an electronic format that displays an image of the printed publication as copied by Public resource, which image allows for electronic page turning of the printed publication. *Id.* at ¶ 37.

67. Public Resource distributed copies of the entirety of the O.C.G.A, contained on USB thumb drives, to the Speaker of the House, Georgia House of Representatives, Mr. Wayne Allen, Legislative Counsel, Office of Legislative Counsel, Georgia General Assembly, and other members of the State of Georgia Legislature. *Id.* at ¶¶ 63-64.

68. Public Resource's purpose in scanning and posting the O.C.G.A. was to facilitate scholarship, criticism and analysis of the official Code, to inform the

public about the laws that govern it, for educational purposes and to encourage public engagement with the law. (Malamud Decl., Ex. A at ¶ 45.

69. After the Commission commenced this action, Public Resource purchased and copied the 2015 volumes and supplements of the O.C.G.A. and copied and posted them on its website. Stip., Dkt. 17 at ¶ 46.

70. In addition to posting volumes of the O.C.G.A. on its own website, Public Resource also posted them on the Internet Archive website, www.archive.org. *Id.* at ¶¶ 50-52, 54-56.

71. Each scanned copy has optimal character recognition, making it significantly more accessible to people who are visually impaired. Malamud Decl., Ex. A at ¶ 46.

72. The process of posting each volume includes significant metadata, such as the names of the titles included in each volume, making them more easily discovered using search engines. *Id.*

73. The process of posting each volume creates a version that is compatible with e-Book readers, smart phones, and tablets. *Id.*

74. Public Resource actively encourages all citizens to copy, use, and disseminate the O.C.G.A. volumes and to create works containing them. *Id.*

75. Public Resource also provides all the volumes in bulk on its servers, allowing users to quickly access the entire Code or a specific volume, and copy and paste relevant sections into their own documents.  *Id.*

76. The Internet Archive's user interface allows readers to search a volume of the O.C.G.A., displaying "pins" for each page that contain the search term, allowing a reader to quickly look for key phrases in different locations. *Id.*

77. In 2014, Public Resource solicited crowd funding on the website <indiegogo.com> to support its scanning and posting of the O.C.G.A.  *Id.* at ¶ 42.

78. This campaign ended on July 11, 2014 and raised approximately $3,000 *Id.* at ¶ 42, 62.

Respectfully submitted this 17th day of May, 2016.

                By:  /s/ Elizabeth H. Rader
                     Jason D. Rosenberg
                     Georgia Bar No. 510855
                     jason.rosenberg@alston.com
                     ALSTON & BIRD LLP
                     One Atlantic Center
                     1201 West Peachtree Street
                     Atlanta, GA  30309-3424
                     Telephone 404-881-7461
                     Fax (404) 253-8861

                     Elizabeth H. Rader
                     *Admitted pro hac vice*
                     elizabeth.rader@alston.com
                     ALSTON & BIRD LLP
                     950 F Street, NW
                     Washington, DC 20004
                     Telephone:  202-239-3008
                     Fax: (202) 239-3333

                     *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA,<br><br>Plaintiff,<br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>Defendant. | CIVIL ACTION<br><br>FILE NO.   1:15-CV-2594-MHC |

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing **Defendant Public.Resource.Org, Inc.'s Local Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment** was electronically filed with Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

> */s/ Sarah P. LaFantano*
> Sarah Parker LaFantano
> Georgia Bar No. 734610