**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CODE REVISION COMMISSION on Behalf of and For the Benefit of the GENERAL ASSEMBLY OF GEORGIA and the STATE OF GEORGIA, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| PUBLIC.RESOURCE.ORG, INC., | ) ) |
| Defendant. | ) ) |

**CIVIL ACTION**

**FILE NO.   1:15-CV-2594-RWS**

**DEFENDANT PUBLIC.RESOURCE.ORG, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO THE COMMISSION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  SUMMARY OF FACTS AND ARGUMENTS ...................................................2

III.  LEGAL ARGUMENTS ........................................................................................4

      A.     The Commission's argument that the statutory text in the O.C.G.A. can be treated differently from the annotations that make it the only official Code of Georgia must fail. ................................................................................4

      B.     The O.C.G.A.'s selections and arrangements lack sufficient originality for copyright to the extent they are mechanical, routine collections of facts or simply follow the previous publisher's format. .....................................8

      C.     To the extent any portion of the O.C.G.A. is copyrightable, Public Resource's scanning and posting the O.C.G.A. is a fair use. ..............12

             i.     The purpose of Public Resource's non-commercial use, to make Georgia's only official Code accessible to the public, favors fair use. ........................................................................................12

             ii.     The nature of the copyrighted work favors fair use. ...............................14

             iii.     Public Resource used no more than necessary to serve the purpose of making the official Code more available to citizens of Georgia and the general public. ..........................................................14

             iv.     The record contains no evidence of harm to the copyright holder or the value of the O.C.G.A. ....................................................16

IV.  CONCLUSION....................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Bellsouth Advert. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc.,*
999 F.2d 1436 (11th Cir. 1993) (en banc) ............................................................10

*Callaghan v. Myers,*
128 U.S. 617 (1888) ......................................................................................6, 7

*Cambridge Univ. Press v. Patton,*
769 F.3d 1232 (11th Cir. 2014)....................................................................passim

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) .........................................................................................16

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991) ...........................................................................................9

*Golan v. Holder,*
132 S. Ct. 873 (2012) .......................................................................................12

*Matthew Bender & Co., Inc. v. West Pub. Co.,*
158 F.3d 674 (2d. Cir 1998) ............................................................................8, 9

*Wheaton v. Peters,*
33 U.S. 591 (1834) ........................................................................................5, 6

LEGAL02/36433166v3

# I.  <u>INTRODUCTION</u>

The Commission asks the Court to decide whether a state can own a copyright in the original and creative annotations of its uncopyrightable state's laws.  But that is not the issue the Court needs to decide to rule on the Commission's motion.  The facts of this case are unique, and the critical issue is much more narrow and fact-specific.  This Court need only decide whether the State of Georgia, having long ago decided that its only official Code should include certain indexes, tables and other factual annotations, should be able to use copyright law to enjoin anyone except its for-profit agent from distributing that official Code.  The answer must be no.  First, the whole O.C.G.A. is one work that is not subject to copyright because it is Georgia's law.  Second, even if the mundane annotations enjoyed a thin copyright, given the undisputed facts and circumstances in this specific case, Public Resource's purchasing, scanning and distributing the O.C.G.A. free to make it more available and more useful to inform the public would constitute a fair use.  Notably, even considering the submissions of proposed Amicus Lexis/Nexis, three years after Public Resource first scanned and posted the O.C.G.A. there is no evidence—only conjecture—that Public Resource's actions could materially impair the marketability of printed volumes of

the O.C.G.A., CD-ROMs, or subscriptions to Lexis/Nexis's online legal research services.

## II.  SUMMARY OF FACTS AND ARGUMENTS

When Carl Malamud started Public.Resource.Org, Inc. ("Public Resource"), he believed the Rule of Law would be strengthened by the wider availability on the Internet of primary legal materials, the raw materials of our democracy.  Malamud Decl., Defendants Statement of Undisputed Material Facts ("DSUMF") Ex. A at ¶¶ 1, 14-15, 19.  In order to promote public education and public safety, equal justice for all, a better informed citizenry, more efficient markets, and the Rule of Law, Public Resource has undertaken to make edicts of government, including the O.C.G.A., available on a noncommercial basis.  *Id.* at ¶ 45.

The State of Georgia enacts and promulgates its laws through its legislature. *Id.* at ¶ 44.  The Code Revision Commission assists the legislature in publishing the laws it enacts in the O.C.G.A.  *Id.* at ¶ 82.  Most of the commissioners are Georgia's elected officials and the Commission's work is supervised by elected legislators.  Ex. D, Ga. Code Ann., Foreword at ix-x.  In 2006, the Commission entered into an agreement for publication with Matthew Bender & Co., Inc. ("Lexis/Nexis").  Ex. F at 1.  The Commission, however, retained oversight and ultimate control over publishing the O.C.G.A.  *Id.* at 3.  The agreement specifies

- 2 -

the Commission's and Lexis/Nexis's respective roles in codifying, publishing, and maintaining the O.C.G.A. It also specifies what the annotations Lexis/Nexis prepares, under the Commission's direct supervision, must contain. *Id.* at 2, 4-5. In return, the State gives Lexis/Nexis exclusive rights to publish the printed O.C.G.A., sell it on CD-ROMs, and provide paid subscribers access to it online. Stip. at ¶¶ 84-85. This exclusivity produces the absurd result that Fastcase, which partners with the State Bar of Georgia to provide its legal research service free to the Bar's 42,000 members, can only provide those lawyers with an "unofficial compilation" of the Code of Georgia, with titles and catchlines written by Fastcase. Declaration of Edward Walters ("Walters Decl."), Ex. L at ¶¶ 8-13).

The publishing agreement also requires that Lexis/Nexis provide Georgia's statutes, stripped of their annotations, on a website that the public can access for free, if they first agree to accept Lexis/Nexis's terms of use. DSUMF Ex. F at 11-12; Stip. at ¶ 73-75, 86-87; Dkt. 17-10; Dkt. 17-9. At least one citizen of Georgia found the requirement to accept those terms of use distasteful, particularly a provision requiring users to agree to jurisdiction in a New York court and provisions prohibiting reuse (such as posting) of the laws on the site even by public and non-profit users. Johnson Decl., DSUMF Ex. K at ¶ 10. The Lexis/Nexis

website also suffers from technical limitations that make it difficult for users to locate and read the laws of Georgia. *Id.* at ¶¶ 11-18.

In addition to these shortcomings, there are other good reasons why Georgia's citizens, and others wishing to know and understand Georgia's laws, might not find the Lexis/Nexis website as useful as the printed O.C.G.A. or another website that provides functionality different from Lexis/Nexis's website. While the Lexis/Nexis free website displays the statutory text and numbering, without the annotations the statutory text simply is not the one official Code of Georgia.

### III.  <u>LEGAL ARGUMENTS</u>

**A.     The Commission's argument that the statutory text in the O.C.G.A. can be treated differently from the annotations that make it the only official Code of Georgia must fail.**

The Commission misconstrues Public Resource's position as asserting that annotations in the O.C.G.A., standing alone, are laws.  Pl.'s Mem. at 16-18. Instead, Public Resource argues that the O.C.G.A. is a single edict of government with one author, Georgia's General Assembly, acting through the Commission. Deft's Mem. at 8-11.  This case is unusual because most official codes are not annotated and most annotated codes are not official.  The cases in which courts have analyzed annotations and found them eligible for a copyright addressed

annotations private companies created for themselves, not annotations that a State commissioned and approved for its only official Code.  As set out in Public Resource's opening brief and DSUMF, the State, particularly acting through its general assembly, decided that the only official Code of Georgia should be annotated.  Deft's Mem. at 3-4; DSUMF at ¶¶ 13-22, 24-29.  To create that annotated official Code, a committee recommended that the laborious editorial process of publishing the O.C.G.A. should be outsourced to an appropriate publisher of legal materials and the General Assembly agreed.  *Id.* at ¶¶ 13-15. This would be a different case if Lexis/Nexis decided to create and publish its own unofficial, Code of Georgia, Annotated.  The ship has sailed, however, and the State cannot change the O.C.G.A's nature to make its state-mandated annotations "unofficial" by passing session laws saying they are not enacted as statutes.  Public Resource has never contended that legislative enactment of statutes is the sole reason the O.C.G.A. is in the public domain as an edict of government.  Nor does Public Resource ask the Court to strike down as unconstitutional those session laws, which Georgia passed in the two sessions between first asserting copyright against Public Resource and filing this action.  The law involved in *Wheaton v. Peters* was judicial opinions, not statutes, and it is settled that such opinions are not subject to copyright.

The Commission's reference to the reported decision of *Wheaton v. Peters* (Pl.'s Mem. at 17) is misleading.  In that case, the parties were private publishers of Supreme Court reports.  The remark that compilations "may be of great utility, but they are not the law" was speaking of compilations of judicial opinions—reporters.  And, moreover, the language quoted in the Commission's brief and presented as the Supreme Court's is actually in the argument of one of the defendants' attorneys, not the Court's opinion, which begins at page 654.  The Supreme Court decided that Wheaton might have exclusive rights to publish his reports under an act of Congress but remanded for a jury trial to determine whether Wheaton had complied with requisite publication of his compliance with the statute in a newspaper and delivery of a copy to the secretary of state.  *Wheaton v. Peters*, 33 U.S. 591, 667-68 (1834); *see also Callaghan v. Myers*, 128 U.S. 617, 648 (1888) (summarizing).

The Commission relies on *Callaghan* for its proposition that the official nature of the O.C.G.A. does not "transform the annotations into the law to make those annotations uncopyrightable."  Pl.'s Mem. at 17.  This—and especially the replacement of original language in the passage quoted with an ellipses—is misleading.  There is no official code of Illinois, annotated or otherwise.  The supplemental materials the Supreme Court found copyrightable by the Court

Reporter, not by Illinois, were headnotes, syllabi of each opinion, lists of the judges composing the court, names of counsel and sometimes their arguments and an index, arranged alphabetically, consisting substantially of a reproduction of the headnotes. *Id.*, 128 U.S. at 633. The State of Illinois did not try what Georgia does here—to commission annotations for the State's only official publication of the statutory law and then assert copyright to limit the public's access to them. "[T]here was no legislation of the state of Illinois which forbade the obtaining of a copyright by [the reporter], or which directed that the proprietary right which would exist in him should pass to the state of Illinois, or that the copyright should be taken out for or in the name of the state, as the assignee of such proprietary right." *Id.* at 647. The Court therefore applied the "general proposition that the reporter of a volume of law reports can obtain a copyright for it as an author, and that such copyright will copy the parts of the book of which he is the author, although he has no exclusive right in the judicial opinions published…" *Id.* at 649 (collecting authority).

Indeed, Public Resource does not argue that the annotations are *transformed* from copyrightable to public domain works when they join the statutory text in the O.C.G.A.'s volumes. Rather, the annotations are born in the public domain. Lexis/Nexis's editors' numerous selections, coordination and arrangements carry

out the General Assembly's and the Commission's deliberate instructions that Georgia's only official Code shall contain titles, catchlines, indexes, research references and the other annotations at issue.  Nor does Public Resource claim that the word *official*, alone, can render any official document uncopyrightable.  Here, the undisputed facts, concerning how the O.C.G.A. came to contain the annotations it does, support holding that the O.C.G.A. is an edict of government and therefore not copyrightable.

### B. The O.C.G.A.'s selections and arrangements lack sufficient originality for copyright to the extent they are mechanical, routine collections of facts or simply follow the previous publisher's format.

As discussed in Public Resource's memorandum in support of its motion, (at 11-13), copyright does not protect expression in a compilation when the selection or arrangement is conventional or dictated by practical considerations.  *Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 674, 681-82 (2d. Cir 1998).  Both the Commission and Lexis/Nexis argue that because some annotated codes meet the originality requirement for registration and copyright protection, the O.C.G.A.'s annotations do too.  Pl. Mem. at 13; Lexis/Nexis Mem. at 16.  The Court should see through this fallacy.  A district court's reasoning that "courts have consistently held that telephone directories are copyrightable" instead of

analyzing the selection and arrangement in the directory at issue was the error the Supreme Court reversed in the *Feist* case. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344 (1991) (describing district court's decision). Instead, section 101 of the copyright act "instructs courts that, in determining whether a fact-based work is an original work of authorship, they should focus on the manner in which the collected facts have been selected, coordinated, and arranged." *Id.* at 358.

The Commission and Lexis/Nexis unsurprisingly focus on the annotations that are summaries of opinions. They point to differences between summaries of the same case in the O.C.G.A. and West's competing annotated code as evidence that the summaries are creative. But this ignores the similarities that flow from the court's decision that some evidence supported the ALJ's calculation of a claimant's weekly wage and award of workers' compensation benefits based on the claimant's testimony. These are facts and, as one court put it, a publisher's overall choice of which procedural facts to include in a case report does not demonstrate the requisite originality or creativity because "names of the parties, the deciding court, and the dates of argument and decision are elementary items, and their inclusion is a function of their importance, not West's judgment." *Matthew Bender*, 158 F.3d at 683.

More importantly, the Commission does not only assert copyright in the summaries; it asserts copyright in numerous different parts of the O.C.G.A. such as "catchlines of code sections; names of titles, Chapters, Articles, Parts, and Subparts, history lines; editors' notes; Code Commission notes; annotations; research references; cross-references; indexes; and other such materials." DSUMF Ex. H. Catchlines are "descriptive headings …to denote the contents of a Code section. DSUMF Ex. F, § 1.4. Names of titles, chapters, articles, parts, and subparts are similar. Descriptive headings consisting of a few words have been held to lack the requisite originality for copyright protection. *Bellsouth Advert. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc.*, 999 F.2d 1436, 1442 (11th Cir. 1993) (en banc). The *Bellsouth* court concluded that headings like "Attorneys" or "Banks" represented such obvious labels for the matter appearing under them as to lack the requisite originality for copyright and that any expressive act in choosing headings for categories would merge with the idea of listing such entities as a class of businesses in a directory. *Id.* at 1444. History lines show where a new Code section appeared in prior official codes to trace that Code section back to its origin. DSUMF Ex. E p. 104. The Code citations are facts and thus not protected elements. Likewise, research references, cross-references and indexes, labor intensive as they may be, are facts that are discovered by Lexis/Nexis's editors, not

creative expression.   None of these parts of the O.C.G.A. are protectable by copyright.

The Commission's claim that Lexis/Nexis's selection and arrangement in the annotations is original should fail for another reason:  the rules for selection and arrangement were largely developed by the Commission and its staff as part of the recodification process that began in 1978.  DSUMF Ex. E at 102.  At that time, the Commission adopted the three unit numbering system combining title, chapter and section numbers separated by a dash, which was already used in a number of other state codes.  *Id.* at 102 and n.4.  At that time, the Commission and editors at the Michie Company decided that case summary annotations would contain direct quotations from the reported decisions, where possible, the full name of the case, the full Georgia Reports, Georgia Appeals Reports, and Southeastern Reporter citations and the year of decision.  *Id.* at 104.  Case annotations will generally be arranged by subject matter, with cases involving the constitutionality of the statute appearing first.  *Id.* at 105-106.  When Lexis/Nexis was awarded the current contract— almost thirty years later—it agreed to "maintain the organization and arrangement of the current Code in all supplements and replacement volumes published under [the] Agreement."  DSUMF at ¶¶ 24, 26; Ex. F at § 1.4.  The same agreement spells out how to choose cases and compile case summary annotations

- 11 -

and what research references, cross-references and indexes the O.C.G.A. must include.  DSUMF ¶¶ 27-29.  Therefore, the overall selection and arrangement of the annotations did not originate with Lexis/Nexis.  For all these reasons, the O.C.G.A.'s annotations are not sufficiently original or creative to be protected by copyright.

**C.    To the extent any portion of the O.C.G.A. is copyrightable, Public Resource's scanning and posting the O.C.G.A. is a fair use.**

     *i.    The purpose of Public Resource's non-commercial use, to make Georgia's only official Code accessible to the public, favors fair use.*

The Eleventh Circuit has stated that applying the fair use doctrine in a way that promotes the dissemination of knowledge, not simply its creation, is consistent with the goals of copyright.  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1282 (11th Cir. 2014) (citing *Golan v. Holder*, 132 S. Ct. 873, 888 (2012)).  The Commission argues that Public Resource's use of the O.C.G.A. was not educational or transformative because it deliberately copied Georgia's Code to provoke this suit.  Pl. Mem. at 19-20.  Public Resource was not simply goading Georgia and other states to make a point, but posted the O.C.G.A, the only official Code of Georgia, for the benefit of citizens.  Malamud Decl., ¶¶ 45-47.  While its

Proclamation of Promulgation has a lighthearted, even cheeky tone, Public Resource tried every possible avenue to communicate with the Commission so it might work together with Public Resource to exploit the Internet's potential to make the O.C.G.A. more readily useable by the public.  For example, within days of receiving the Commission's cease-and-desist letter, Carl Malamud wrote back a reasoned defense of Public Resource's actions, concluding "I would be more than happy to come to Georgia to discuss this matter with you."  Stip. Ex. D, Dkt. 17-4. But the Commission has never once agreed to such a dialogue.  Fastcase also tried to obtain a license to make the O.C.G.A. available online to its bar association subscribers, but the Commission would not talk with them either.  Walters Decl., ¶¶ 8-13.

The Commission and Lexis/Nexis defend Lexis/Nexis's free statutory code website and argue that the public has plenty of access to the statutory code and the O.C.G.A.  But whether the Lexis/Nexis free site is problematic is immaterial; fundamentally, this case is about others' rights to build other websites that speak the official Code of Georgia.  Even assuming Georgia's websites and libraries provide some public access to the statutory code and the O.C.G.A., Public Resource's posting the O.C.G.A. online still *increases* public access to the one

- 13 -

official Code of Georgia, consistent with copyright's goal to spread knowledge in addition to providing incentives to create works.

.

### ii.    The nature of the copyrighted work favors fair use.

As discussed in Public Resource's memorandum in support of its own motion for summary judgment, the O.C.G.A. is primarily a compilation of facts, and therefore the scope of fair use is greater than it would be for a more creative work.  Deft's Mem. at 18-19.  The Commission asserts that the statutes are facts but the annotations are opinions—without any explanation of why the Court should consider them opinions.  As discussed in section III B above, catchlines, history lines, editor's notes, research references, cross-references and indexes are nothing but factual.  Case annotations include summaries of opinions, but that does not make *them* opinions.  Additionally, the Court could properly consider that the O.C.G.A. is the only official Code of Georgia as bearing on the second fair use factor and weighing in favor of fair use.

### iii.    Public Resource used no more than necessary to serve the purpose of making the official Code more available to citizens of Georgia and the general public.

LEGAL02/36433166v3

Public Resource purchased, scanned, posted and distributed the entire

O.C.G.A. because posting the statutory text would not serve the same purpose of

making the only official Code of Georgia more available and useful to the public.

Scholarship, analysis and other public engagement would be undermined without

free access to the complete official Code, which includes annotations by design.

Judges, lawyers and citizens treat the annotations as authoritative and rely on them

to interpret the Code.  Therefore, Public Resource posts as much of the O.C.G.A.

as is necessary to fulfill its purpose.

The Commission offers no analysis of factor three beyond observing that

excessive verbatim copying weighs against fair use.  It fails to acknowledge the

authorities explaining that verbatim copying of a work is sometimes necessary to

serve a fair use purpose.  See Deft's Mem. at 14-15; 19-20.  Nor does it explain

why the Court should find Public Resource's use of the whole O.C.G.A. excessive.

Amicus Lexis/Nexis tries a little harder but essentially argues that generally use of

an entire work may not constitute a fair use, so Public Resource's nonprofit, public

interest use of the O.C.G.A., including its annotations, is not either.  The Eleventh

Circuit, however, has expressly stated that a court abdicates its duty to analyze the

third factor for each instance of alleged infringement by applying a blanket rule or

benchmark.  *Cambridge* at 769 F.3d at 1271-72.  That court noted that "fair use

- 15 -

analysis must be performed on a case-by-case/work-by-work basis." *Id.* at 1272, citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584-85 (1994). The *Cambridge* court invoked the Supreme Court's instruction to avoid "hard evidentiary presumption[s]" and "eschew a rigid, bright-line approach to fair use." *Id.* quoting *Campbell*. For the same reason, the district court properly considered whether the individual instances of alleged infringement were excessive in relation to the defendants' pedagogical purpose. *Id.* at 1275. Here, Public Resource's educational and public interest purpose required using the whole O.C.G.A. and the Court can find that this factor does not weigh against fair use.

### iv.   *The record contains no evidence of harm to the copyright holder or the value of the O.C.G.A.*

The Commission's two-paragraph discussion of factor four is far too conclusory to support a finding that this factor weighs against fair use. Instead of describing the market for the O.C.G.A. and pointing to any scintilla of evidence of likelihood of harm to it, the Commission and Lexis/Nexis essentially ask the Court to apply a presumption of market harm from Public Resource's scanning, posting and distributing the O.C.G.A. But there is no precedent for such a presumption and the law of fair use forbids it. The Commission cites and quotes the *Cambridge* decision, but then essentially ignores what *Cambridge* teaches about how to

- 16 -

identify the relevant market and analyze evidence relating to potential harm.  That case teaches that, in a sense, the copyright grant's terms include a transaction cost: an implied license to the public for fair use of the work.  *Cambridge*, 769 F.3d at 1257.  To determine the scope of fair use, courts should imagine a hypothetical perfect market for the work in question and then ask how much of that market fair users can capture without removing the copyright holder's incentive to propagate the work.  *Id.* at 1258.  Ideally, the copyright holder will sell the work to buyers who can pay the market rate and tolerate secondary uses which do not undermine the market for the work.

Here, the market for the O.C.G.A. is unusual, to say the least.  The Commission sets the price Lexis/Nexis can charge buyers and keeps it low.  DSUMF Ex. F at 19, 40; Howerton Decl., ¶ 6.  The agreement treats Lexis/Nexis's online service and CD-ROM product differently than the printed, bound volumes.  DSUMF Ex. F at 23-25.  West Publishing charges five times as much for its competing Code of Georgia, annotated and presumably gets it—even though it is an unofficial compilation and not State of Georgia-approved.  Howerton Decl. at ¶ 9.  Lexis/Nexis must provide the Commission the electronic database version of the O.C.G.A.  DSUMF Ex. F at 12.  Lexis/Nexis cannot charge defined State Government Subscribers, who might otherwise

- 17 -

purchase the printed, bound volumes, for subscriptions to the C.D.-ROM. *Id.* at

13. And it gets more complicated. State Government Subscribers can also copy,

print and sell, as books, the parts of the O.C.G.A. that relate to their own

department or agency. *Id.* The agreement describes the market for the CD-ROM

product as "the courts, government agencies, law libraries, law firms, members of

the Georgia Bar, legal assistants and other potential subscribers." *Id.* at 37. The

Court can logically conclude, therefore, that neither the Commission nor

Lexis/Nexis considered Georgia citizens outside of the legal community an

important enough market to list in the agreement, much less such individuals who

reside outside of Georgia. When Fastcase sought to purchase a license to provide

the O.C.G.A. online as part of its online legal research service, however, it was

told no such license would be granted at any price. Walters Decl. at ¶ 8-13.

Lexis/Nexis's printed O.C.G.A. also has qualities not achieved via online access or

thumb drive content. The agreement requires specified paper and binding

materials and sewing in a specified way "to produce a volume as strong as that

commonly known as 'Library Editions.'" DSUMF Ex. F at 16. If these qualities

are important to the State, it follows that they are important to some potential

purchasers like courts, law libraries, and law firms and that these purchasers will

not consider scans or downloads of scans a competing substitute for the printed,

- 18 -

bound O.C.G.A.  Finally, Lexis/Nexis's cost to publish O.C.G.A. rises every year, making the printed publication "a struggle" every year.  DSUMF Ex. I. Lexis/Nexis blames the Commission's refusal to let it raise the price of the printed O.C.G.A. for its struggles.  *Id.*

Because of the publishing agreement's unusual nature, the State does not receive revenue from royalties on the sale of printed, bound volumes of the O.C.G.A. in the first place.  Ex. O at 14.  If any sales of books are lost, Lexis/Nexis is deprived of revenues, but it is not the copyright holder.  Assuming this were true, it is not harm to the market for the O.C.G.A.  It is a different kind of harm not relevant to a fair use analysis.

*Cambridge* teaches that the scope of fair use in a given case is an *evidentiary* question.  769 F.3d at 1258.  Where the publishers offered no evidence showing that they lost any book sales in or after 2009, the district court did not err in finding that the defendants' use did not affect the plaintiffs' actual or potential sale of books.  *Id.* at 1276.  The court also considered whether the defendants' use damaged the market for licenses for digital excerpts.  Where a license was available for digital excerpts, the district court properly weighed the fourth factor against fair use.  Where there was no evidence that a license for digital use of a given work was available in the market, however, the district court properly

weighed the fourth factor in favor of fair use.  *Id.* at 1279.  Although the alleged

infringer has the overall burden to show lack of substantial damages to the market,

the court reasoned that the publishers could reasonably be expected to have

evidence of a market for digital licenses.  *Id.*  It was reasonable, therefore, to place

the burden of going forward with such evidence on them and, where no such

evidence was offered, to presume that no market for digital permissions for a given

work existed.  Here, neither the Commission nor Lexis/Nexis can point to any

evidence of lost sales—print, online subscription, or CD-ROM—in the three years

since Public Resource scanned, posted and distributed the O.C.G.A.  Nor can it

show that Public Resource could have obtained a license to use the O.C.G.A. on its

website as it does.  The Commission rejected Fastcase's offer to do just that.

Importantly, the agreement between the Commission and Lexis/Nexis requires

Lexis to track use of the statutory code on its free site and report "the effect, if any,

on subscriptions to the Code in print and on CD-ROM."  DSUMF Ex. F at 12.  But

neither the Commission nor Lexis/Nexis has not offered any such report.

Finally, as set forth in Public Resource's memorandum in support of its

motion for summary judgment (at 22-24), in many cases a citizen's ability to

consult the O.C.G.A. on its website for free would not displace a purchase from

Lexis/Nexis.  As the Commission observes, people can read the entire O.C.G.A.

for free if they have access to a state or county library, state university or county law enforcement office within the State of Georgia.  The Commission and Lexis/Nexis do not contend that a citizen's use at those Georgia facilities supplants the normal market.  Just like a library, Public Resource purchased the O.C.G.A. sets that it scanned and posted.  If *exactly* what Public Resource did was widespread, Lexis/Nexis would sell more books, not fewer.  For all these reasons, the Court can properly find that Public Resource's use has had no effect on actual or potential sales of the O.C.G.A. Therefore, the fourth factor is neutral or favors fair use.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant summary judgment in favor of Public Resource on its counterclaim and both the Commission's claims.

- 21 -

Respectfully submitted this 7th day of June, 2016.

By: */s/ Elizabeth H. Rader*

Jason D. Rosenberg
Georgia Bar No. 510855
jason.rosenberg@alston.com
Sarah P. LaFantano
Georgia Bar No. 734610
sarah.lafantano@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone 404-881-7461
Fax (404) 253-8861

Elizabeth H. Rader
*Admitted pro hac vice*
elizabeth.rader@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3008
Fax: (202) 239-3333

*Attorneys for Defendant*

- 22 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

CODE REVISION COMMISSION on )
Behalf of and For the Benefit of the )
GENERAL ASSEMBLY OF )  **CIVIL ACTION**
GEORGIA and the STATE OF )
GEORGIA, )  **FILE NO.   1:15-CV-2594-RWS**
)
       Plaintiff, )
v. )
)
PUBLIC.RESOURCE.ORG, INC., )
)

       Defendant.

_____

<u>**CERTIFICATE OF COMPLIANCE**</u>

I hereby certify that, pursuant to L.R. 5.1C and 7.1D of the Northern

District of Georgia, the foregoing **Defendant Public.Resource.Org, Inc.'s**

**Memorandum of Law In Opposition to the Commission's Motion for Partial**

**Summary Judgment** complies with the font and point selections approved by the

Court in L.R. 5.1C. The foregoing pleading was prepared on a computer using 14-

point Times New Roman font.

                            */s/ Sarah P. LaFantano*
                            Sarah Parker LaFantano
                            Georgia Bar No. 734610

LEGAL02/36379790v4

| | |
|---|---|
| CODE REVISION COMMISSION on | ) |
| Behalf of and For the Benefit of the | ) |
| GENERAL ASSEMBLY OF | ) **CIVIL ACTION** |
| GEORGIA and the STATE OF | ) |
| GEORGIA, | ) **FILE NO.  1:15-CV-2594-RWS** |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| PUBLIC.RESOURCE.ORG, INC., | ) |
| | |
| Defendant. | |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Defendant Public.Resource.Org, Inc.'s**

**Memorandum of Law In Opposition to the Commission's Motion for Partial**

**Summary Judgment** was electronically filed with Clerk of Court using the

CM/ECF system which will automatically send notification of such filing to all

attorneys of record.


*/s/ Sarah P. LaFantano*
Sarah P. LaFantano
Georgia Bar No. 734610

- 1 -